UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HOUSE OF EUROPE FUNDING I LTD, and
ERSTE ABWICKLUNGSANSTALT,

                    Plaintiffs,

     -against-

WELLS FARGO BANK, N.A. and
COLLINEO ASSET MANAGEMENT
GMBH,

                 Defendants.

Case No. 13 cv 519 (RJS / SN)

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

FACTS ...................................................................................................................3

I.    THE PLAINTIFFS..........................................................................................3

    A.    Plaintiff House of Europe Funding I Ltd. ...............................................3

    B.    Plaintiff Erste Abwicklungsanstalt ........................................................4

II.    DEFENDANTS' DUTIES UNDER THE TRANSACTION AGREEMENTS ................4

    A.    Defendants' Obligations to Enforce the Eligibility Criteria Limiting Investments in "CDO Securities" to 15% of HOE I's Investment Portfolio ..........5

        1.    Collineo's Obligation to Identify Assets that Satisfy the Eligibility Criteria ...............................................................5

        2.    Wells Fargo's Obligation as Collateral Administrator to Verify that the Proposed Assets Meet the Eligibility Criteria.......................................5

        3.    Wells Fargo's Obligation as Trustee to Purchase Proposed Assets Only If Such Purchase Does Not Breach the Eligibility Criteria................6

    B.    Defendants' Obligation to Prepare and Disseminate Accurate Monthly Reports ...................................................................7

        1.    Wells Fargo's Obligation to Prepare and Disseminate  Accurate Monthly Reports ......................................................7

        2.    Collineo's Obligation to Assist Wells Fargo in the Preparation and Dissemination of Accurate Monthly Reports ...............................8

III.    DEFENDANTS BREACHED THEIR OBLIGATIONS TO PLAINTIFFS UNDER THE TRANSACTION AGREEMENTS ...................................................9

    A.    Defendants Breached the Eligibility Criteria By Purchasing CDO Securities In Excess of the 15% Limit ........................................9

    B.    Defendants Compounded Their Breaches By Issuing False Monthly Reports ...................................................................9

    C.    Defendants Admit Their Reporting Errors ........................................11

D.      The Parties Discuss Plaintiffs' Allegations and Execute a Tolling
        Agreement ........................................................................................11

ARGUMENT ....................................................................................................12

I.      MOTION TO DISMISS STANDARD ..................................................12

II.     WELLS FARGO BREACHED THE TRANSACTION AGREEMENTS ......................13

        A.      Wells Fargo Breached the Transaction Agreements By Investing in the
                Excess CDO Securities .............................................................13

                1.      Wells Fargo Breached the CAA By Failing to Determine, at the
                        Time of Purchase, that the Excess CDO Securities Violated the
                        Eligibility Criteria ......................................................13

                2.      Wells Fargo Breached the Indenture By Investing in the  Excess
                        CDO Securities ..........................................................16

        B.      Wells Fargo Breached the Transaction Agreements By  Preparing False
                Reports ...............................................................................17

        C.      Plaintiffs Have Sufficiently Alleged Declaratory Judgment Claims ...................19

III.    PLAINTIFFS ADEQUATELY ALLEGED DEFENDANTS' CULPABILITY .............19

        A.      The Indenture Does Not Limit the Trustee's Liability to Gross Negligence.........19

        B.      Defendants Acted With Gross Negligence Under the AMA and CAA................19

IV.     PLAINTIFFS HAVE STANDING TO ENFORCE THE TRANSACTION
        AGREEMENTS AND SEEK REDRESS FOR THEIR INJURIES ................................22

        A.      HOE I Has Standing to Enforce Its Contracts and Protect Its Collateral..............22

                1.      HOE I Has Injury In Fact Standing to Enforce the Indenture...................23

                2.      Wells Fargo's In Pari Delicto Affirmative Defense Fails..........................24

                3.      HOE I Has Standing to Enforce the AMA Against Collineo ...................26

        B.      EAA Has Standing to Redress Its Injuries and Enforce the  Transaction
                Agreements ..........................................................................28

                1.      EAA Has Alleged and Experienced Injury.................................28

                2.      WestLB Assigned All Rights to EAA ......................................30

3.      The Indenture's "No Action" Clause Does Not Apply to EAA's Claims .................................................................................31

4.      EAA Is a Third Party Beneficiary of the CAA ......................................33

V.    THE STATUTE OF LIMITATIONS DOES NOT BAR THIS SUIT .............................35

A.    HOE I Is Subject to the Cayman Islands' Statute of Limitations .........................36

B.    The German Statute of Limitations Does Not Bar EAA's Claims ......................37

1.      EAA Is Not Barred From Asserting Claims for  Breach of the Eligibility Criteria ..................................................................................38

2.      EAA Is Not Barred From Asserting Claims Arising Out of Defendants' False Monthly Reports .......................................................40

CONCLUSION.......................................................................................................40

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Absolute Activist Master Value Fund, Ltd. v. Ficeto,*
    2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) .......................................................35

*Am. Motorist Ins. Co. v. Morris Goldman Real Estate Corp.,*
    2004 WL 1396260 (S.D.N.Y. June 18, 2004) ....................................................20

*Argonaut Partnership, LP. v. Bankers Trustee Co. Ltd.,*
    1997 WL 45521 (S.D.N.Y. 1997) ...........................................................28, 29

*Baena v. Woori Bank,*
    2006 WL 2935752 (S.D.N.Y. Oct. 11, 2006) ....................................................36

*Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.,*
    2010 WL 4449366 (S.D.N.Y. Oct. 13, 2010) ....................................................28

*Bano v. Union Carbide Corp.,*
    361 F.3d 696 (2d Cir. 2004) .................................................................35

*Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank,*
    57 F.3d 146 (2d Cir. 1995) ..................................................................31

*Bayerische  Landesbank v. Aladdin Capital Mgmt, LLC,*
    692 F.3d 42 (2d Cir. 2012) ..................................................................19

*Beacon Hill CBO, II, Ltd. v. Beacon Hill Asset Mgmt. LLC,*
    314 F. Supp. 2d 205 (S.D.N.Y. 2003) ........................................................24

*BrandAid Mktg. Corp. v. Biss,*
    462 F.3d 216 (2d Cir. 2006) .................................................................26

*Brink's Ltd. V. South African Airways,*
    93 F.3d 1022 (2d Cir. 1996) .................................................................30

*Chambers v. Time Warner Inc.,*
    282 F.3d 147 (2d Cir. 2002) ..............................................................12, 25

*Cohen v. S.A.C. Trading Corp.,*
    711 F.3d 353 (2d Cir. 2013) .................................................................12

*Colnaghi USA Ltd. v. Jewelers Protection Services, Ltd.,*
    81 N.Y.2d 821 (1993) .......................................................................20

*Cruden v. Bank of New York,*
    957 F.2d 961 (2d Cir. 1992) .................................................................32

*Ellington Credit Fund v. Select Portfolio Servicing, Inc.,*
    837 F. Supp. 2d 162 (S.D.N.Y. 2011) ......................................................32, 33

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*,
   66 N.Y.2d 38 (1985) ...................................................................................34

*Global Network Communs ., Inc. v. City of New York*,
   458 F.3d 150 (2d Cir. 2006).................................................................13, 25

*Gordon v. Dino De Laurentiis Corp.*,
   529 N.Y.S.2d 777 (1st Dep't 1988)...........................................................28

*Harris v. City of New York*,
   186 F.3d 243 (2d Cir.1999).......................................................................35

*Hildene Capital Mgmt., LLC v. Bank of New York Mellon*,
   963 N.Y.S.2d 38 (1st Dep't 2013).......................................................23, 24

*Hilgendorff v Hilgendorff*,
   241 A.D.2d 481 (2d Dept 1997) ...............................................................26

*Howe v. Bank of New York Mellon*,
   783 F. Supp. 2d 466 (S.D.N.Y. 2011).............................................31, 32, 33

*Industrial Risk Insurers v. Port Authority of New York and New Jersey*,
   387 F. Supp. 2d 299 (S.D.N.Y. 2005).......................................................20

*Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co.*,
   261 A.D.2d 117 (1st Dep't. 1999) .............................................................22

*In re KDI Holdings, Inc.*,
   277 B.R. 493 (Bankr. S.D.N.Y. 1999) ......................................................26

*Lehman Bros, Inc. v. Piper Jaffray & Co.*,
   2008 WL 5129084 ...................................................................................26

*Levine v. AtriCure, Inc.*,
   594 F. Supp. 2d 471 (S.D.N.Y. 2009).......................................................25

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ...........................................36

*M.E.S., Inv. v. Snell*,
   712 F.3d 666 (2d Cir. 2013).....................................................................12

*MacDraw, Inc. v. CIT Group Equipment Financing, Inc.*,
   1994 WL 17952 (S.D.N.Y. Jan. 18, 1994) ...........................................34, 35

*Maiden v. Biehl*,
   582 F. Supp. 1209 (S.D.N.Y. 1984)..........................................................36

*Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
   2004 WL 1444868 (S.D.N.Y. June 25, 2004) ......................................31, 32

*National Market Share, Inc. v. Sterling Nat. Bank*,
   392 F.3d 520 (S.D.N.Y. 2004)..................................................................28

*Nelly de Vuyst, USA, Inc. v. Europe Cosmetiques, Inc.*,
   2012 WL 246673 (S.D.N.Y. Jan. 6, 2012) ...........................................................35

*Nomura Sec. Int'l, Inc. v. ETrade Sec., Inc.*,
   280 F. Supp. 2d 184 (S.D.N.Y. 2003)................................................................26

*Oost-Lievense v. N. Am. Consortium, P.C.*,
   969 F. Supp. 874 (S.D.N.Y. 1997) ....................................................................35

*Phoenix Light SF Limited v. ACE Securities Corp.*,
   2013 WL 1788007 (N.Y. Sup. Ct. Apr. 14, 2013)..........................................36

*RCG, LLC v. Am. Broadband Commc'ns, LLC*,
   11 CIV. 257, 2011 WL 2162974 (S.D.N.Y. May 31, 2011)..............................14

*Racepoint Partners, LLC v. JPMorgan Chase Bank*,
   2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006) .............................................30, 31

*Rivera v. Bank of America Home Loans*,
   2011 WL 1533474 (S.D.N.Y. Apr. 21, 2011)...................................................34

*Robb Evans & Associates LLC v. Sun Am. Life Ins.*,
   2013 WL 123727 (S.D.N.Y. Jan. 8, 2013) .......................................................37

*Robin Bay Associates, LLC v. Merrill Lynch & Co.*,
   2008 WL 2275902 (S.D.N.Y. June 3, 2008) ....................................................20

*Ross v. Bolton*,
   904 F.2d 819 (2d Cir. 1990)..............................................................................26

*Roth v. Jennings*,
   489 F.3d 499 (2d. Cir. 2007)............................................................................12

*Sch. Dist. of City of Niagara Falls, N.Y. v. CrossPointe, LLC*,
   2012 WL 1144618 (W.D.N.Y. Apr. 4, 2012) ..................................................29

*Semi-Tech Litig., LLC v. Bankers Trust Co.*,
   272 F. Supp. 2d 319 (S.D.N.Y. 2003) *aff'd and adopted*,
   *In re Bankers Trust Co.* 450 F.3d 121 (2d Cir 2006).........................................30

*Society of Plastics Indus v. County of Suffolk*,
   77 N.Y.2d 761 (1991) .......................................................................................23

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
   925 F.2d 566 (2d Cir. 1991).............................................................................34

*Victor v. Riklis*,
   1992 WL 122911 (S.D.N.Y. May 15, 1992) ...................................................33

*Walnut Place LLC v. Countrywide Home Loans, Inc.*,
   948 N.Y.S.2d 580 (1st Dep't 2012).................................................................33

*Walnut Place LLC v. Countrywide Home Loans, Inc.*,
   2012 WL 1138863 (N.Y. Sup. Ct. Mar. 28, 2012) .........................................33

*WestLB AG v. BAC Florida Bank*,
    2012 WL 4473445 (S.D.N.Y. 2012) ......................................................................................28

*Williams v. Time Warner, Inc.*,
    440 Fed. Appx. 7 (2d Cir. 2011) ........................................................................................12

## PRELIMINARY STATEMENT

This case concerns the Defendants' abdication of their responsibilities to safeguard the interests of HOE I and its investors.  First, Collineo as HOE I's Asset Manager failed in its obligation to identify and propose assets for purchase by HOE I that complied with the contractually required Eligibility Criteria.  Second, Wells Fargo as HOE I's Collateral Administrator failed in its duties to determine whether the purchase of the assets Collineo proposed would cause the Eligibility Criteria to be breached.  Third, Wells Fargo in its additional role as HOE I's Trustee failed in its duty to purchase proposed assets only if such purchase would comply with the Eligibility Criteria.  And, finally, both Defendants failed in their duties to issue monthly reports that accurately reflected HOE I's performance.  As a result of these failures—which each constituted an actionable contractual breach—the Defendants caused HOE I to buy €129.5 million of CDO Securities that were ineligible for purchase when bought and have since lost nearly all their value, causing massive losses to HOE I and its investors, including EAA.

The Defendants' motions to dismiss reveal that Collineo has no real substantive defense to Plaintiffs' allegations.  Wells Fargo's only substantive defense is to claim that it was entitled to rely on Collineo to determine compliance with the Eligibility Criteria and that, despite its dual role as both Trustee and Collateral Administrator, it had no obligation to prevent these breaches from occurring.  Indeed, remarkably, Wells Fargo contends that, even though these breaches were so apparent that it would have been grossly negligent for HOE I's investors to be unaware of them, Wells Fargo was nonetheless entitled to effectuate the breaches by purchasing the ineligible securities with impunity.  Needless to say, these defenses have no merit.

As a result, Defendants' motions rely primarily on a grab bag of arguments relating to standing and statutes of limitation.  With respect to HOE I's standing to sue, Wells Fargo relies

on inapposite cases to argue that HOE I has suffered no injury in fact, despite clear case law to the contrary. Collineo does not join that argument but claims, instead, that HOE I assigned away its right to sue, despite clear language in the operative agreements expressly providing that HOE I should bring suit. As for EAA's standing, Wells Fargo claims that EAA suffered no injury, did not hold its Notes at the time of the alleged breach(es), and is not a third party beneficiary to the Collateral Administration Agreement. Wells Fargo ignores, however, that Defendants' breaches have already resulted in realized losses of approximately €107 million, that EAA succeeded to all rights in the Notes (including the right to bring suit for prior breaches) under German law, and that the relevant agreements specifically recognize EAA's interest as a "Secured Party" in the Collateral Administration Agreement. Wells Fargo as Collateral Administrator (but not as Trustee) and Collineo also argue that the Indenture's "no action" clause bars EAA's claims, but such clauses are strictly construed and do not govern the claims at issue here.

As to Defendants' statute of limitations arguments, Collineo's contention that the claims by HOE I—a Cayman Islands corporation—are subject to the *German* statute of limitations because one of its bondholders (EAA) is a German entity finds no support in reason or case law (which is likely why Wells Fargo does not join in this specious argument). Defendants also argue that EAA's claims are time-barred under German law because WestLB, the entity holding EAA's notes at the time of the 2006 and 2007 breaches, knew, or should have known but for its own gross negligence, of these breaches. But this is a fact intensive issue that cannot be resolved at this stage. Defendants' resort to purported German law experts does not help its cause as— even assuming WestLB's gross negligence could be imputed to EAA—WestLB had no duty under German law to recalculate the Eligibility Criteria tests to uncover Defendants' breaches.

For these reasons, Defendants' motions to dismiss should be denied.

## FACTS

Unless noted otherwise, the following facts are based on allegations in the Complaint and the exhibits attached thereto—the Amended and Restated Indenture (the "Indenture"), the Collateral Administration Agreement (the "CAA"), and the Asset Management Agreement (the "AMA" and, with the Indenture and CAA, the "Transaction Agreements")—and are subject to change as discovery proceeds.

## I.     THE PLAINTIFFS

### A.     Plaintiff House of Europe Funding I Ltd.

Plaintiff House of Europe Funding I Ltd.  ("HOE I") is a company incorporated under the laws of the Cayman Islands.  (Compl. ¶ 12.)  HOE I maintains an office in the Cayman Islands where it keeps all documents, books and records (Indenture §§ 7.03(a), 14.03(a)), maintains a Cayman Islands bank account (*id.* § 7.10(a)(vii)), and pays Cayman Islands taxes (*see, e.g.*, *id.* § 11.01(a)(i)(1) (noting that interest proceeds go first "to the payment of the taxes and filing fees (including, without limitation, Cayman Islands statutory and annual return fees)")).  HOE I's Administrator is MaplesFS (formerly known as Maples Finance Limited), a Cayman Islands licensed trust company.  (*Id.* p. 4.)

HOE I's business is to invest in a portfolio of assets (the "Collateral"), and issue notes referred to as collateralized debt obligations ("CDOs") backed by that Collateral.  (Compl. ¶ 20.) The CDO notes HOE I issued were segmented into three tranches: Class A Notes, Class B Notes and Class C Notes (collectively, the "Notes").  (Indenture § 2.02(b).)  Generally speaking, the Class A Notes have payment priority over the Class B Notes, which in turn have payment priority over the Class C Notes.  (*Id.* § 11.01(a).)  HOE I also issued Certificates.  If there are any assets remaining after the Notes are paid in full, additional proceeds are to be distributed to the

Certificateholders.  (*Id.* at § 11.01(a)(i)(16), 11.01(a)(ii)(4)-(9).)  In this way, just like any other company, HOE I has both creditors (the Noteholders) and equity owners (the Certificateholders).

### B.      Plaintiff Erste Abwicklungsanstalt

Plaintiff Erste Abwicklungsanstalt ("EAA") is a German public law agency established under the German Financial Markets Stabilization Funds Act (the *Finanzmarktstabilisierungsfondsgesetz*).  (Compl. ¶ 13.)  EAA holds 100% of the Class A Notes issued by HOE I and is the Controlling Party under the Indenture.  (*Id.*)  EAA obtained the Class A Notes pursuant to a Spin-off and takeover agreement (the "Spin-Off Agreement") (attached as Exhibit D to the Declaration of Dirk Zetzsche (the "Zetzsche Decl.")) which, as a matter of German law, transferred all of WestLB's rights, obligations, liabilities and claims to EAA. (Zetzsche Decl. ¶¶ 30-32.)

## II.     DEFENDANTS' DUTIES UNDER THE TRANSACTION AGREEMENTS

The value of the Notes is derived from the strength of the Collateral securing them. (Compl. ¶ 27.)  Accordingly, the acquisition and management of the Collateral securing the Notes is of critical importance to HOE I and its investors.  (*Id.*)  HOE I retained two established firms—Defendants' Wells Fargo and Collineo—to perform these important functions.  (Compl. ¶ 28.)  HOE I further protects its Collateral and its investors by limiting both Defendants' discretion and assigning the Defendants overlapping duties to ensure that the established safeguards are not breached.  (Compl. ¶ 28-48.)  One of the most important of these safeguards is the investment "Eligibility Criteria," which set limits on the types of assets that can be purchased. (*Id.* ¶¶ 27-28.)  Because Wells Fargo and Collineo are permitted to change the composition of the Collateral after investors purchased the Notes, it is particularly critical that Wells Fargo and Collineo comply with their duties, especially with respect to the Eligibility Criteria.  (Compl. ¶ 28.)  Those duties were set forth in the Transaction Agreements.

**A.    Defendants' Obligations to Enforce the Eligibility Criteria Limiting Investments in "CDO Securities" to 15% of HOE I's Investment Portfolio**

The Eligibility Criteria are set forth in the Indenture (Indenture § 12.02), and require Wells Fargo and Collineo to ensure, among other things, that "the Aggregate Principal Amount of all CDO Securities does not exceed 15% of the Maximum Investment Amount."  (*Id.* § 12.02(28).)  Because a CDO issuer's investment in other CDOs is considered a particularly risky type of investment (Compl. ¶ 30), this provision limits HOE I's investments in other CDOs to 15% of HOE I's total investment portfolio.  (*Id.* ¶ 31.)  As noted below, each defendant has a role in ensuring that these Eligibility Criteria are met.

**1.    Collineo's Obligation to Identify Assets that Satisfy the Eligibility Criteria**

As Asset Manager, Collineo is obligated to identify assets for purchase by HOE I that comply with the Eligibility Criteria.  (Compl. ¶¶ 32-35.)  Section 2.01(c) of the AMA provides that Collineo may identify assets for purchase by HOE I "in accordance with the Eligibility Criteria."  (AMA § 2.01(c); Compl. ¶ 32.)  Further, Section 2.03(f) requires Collineo to comply with such "duties and responsibilities as may be required of the Asset Manager as set forth in the Indenture," and Section 12.02 of the Indenture, obliges Collineo to "instruct the Indenture Trustee [*i.e.*, Wells Fargo]" to purchase assets on behalf of HOE I "[s]ubject to satisfaction" of the Eligibility Criteria.  (AMA § 2.03(f); Indenture § 12.02; Compl. ¶ 34.)

**2.    Wells Fargo's Obligation as Collateral Administrator to Verify that the Proposed Assets Meet the Eligibility Criteria**

Once Collineo has identified assets to be purchased, and before the "proposed" security is "to be included in the Collateral," Wells Fargo as Collateral Administrator is required under Section 2(e) of the CAA to verify that the purchase of the proposed security would comply with the Eligibility Criteria. (CAA § 2(e); Compl. ¶ 39.)  This obligation includes determining whether the CDO Security limitation would be breached:

"(e)  In reference to Section 12.02 of the Indenture [the Eligibility Criteria], ***Wells Fargo shall perform*** the following functions ***in connection with and as of the date of the Grant*** of any obligation or security ***proposed to be included in the Collateral*** as a Pledged Underlying Asset:

…

(xxiii)  If such Underlying Asset is a ***CDO Security***, determine if the Aggregate Principal Amount of all such Underlying Assets…does not exceed [15%] of Maximum Investment Amount."

(CAA § 2(e)(xxiii); Compl. ¶ 39.)  There is nothing in Section 2(e) that allows Wells Fargo to rely on representations made by Collineo as to what is and what is not a CDO Security or in calculating the amount of CDO Securities in the Collateral.  Instead, the CAA explicitly directs that Wells Fargo "shall" create and maintain its own database of the Collateral:

"(b) Wells Fargo shall perform the following functions:
(i)  Create a Collateral database;
…
(iv)  Update the Collateral database for Underlying Assets and Eligible Investments acquired or sold or otherwise disposed of."

(CAA § 2(b).)

3.   <u>Wells Fargo's Obligation as Trustee to Purchase Proposed Assets Only If Such Purchase Does Not Breach the Eligibility Criteria</u>

Apart from its role as Collateral Administrator, Wells Fargo as Trustee is also responsible for a wide range of duties set forth in the Indenture.  Among those is Wells Fargo's responsibility to acquire the assets that Collineo proposes, and that Wells Fargo as Collateral Administrator verifies, but only if such acquisition would not breach the Eligibility Criteria.  (*See* Indenture § 12.02 (providing for the purchase of proposed assets "if, after such investment, the following criteria (the 'Eligibility Criteria') are satisfied or, if such criteria have not been satisfied prior to the addition of such Underlying Asset, not made worse.").  *See also* 10.02(f); Compl. ¶ 37.)

To make this determination, Wells Fargo as Trustee is required to review all information at its disposal, including the calculations it was required to perform as Collateral Administrator

under Section 2(e) of the CAA, and the Collateral Database it is required to maintain under

Section 2(b) of the CAA.  (*See* CAA §§ 2(b) & 2(e) (noting that the calculations are required

"[i]n reference to Section 12.02 of the Indenture").)  The Indenture and CAA vest final

investment decision-making authority in Wells Fargo (a non-German entity), as opposed to

Collineo (a German entity), in part because having such decisions made outside Germany was

necessary to prevent HOE I from being deemed a German entity for tax purposes. (Compl. ¶ 40.)

**B.    Defendants' Obligation to Prepare and Disseminate Accurate Monthly Reports**

In addition to their obligations to ensure that assets are purchased in compliance with the

Eligibility Criteria, the Defendants also have the obligation to accurately report the assets that

were purchased and whether those assets complied with the Eligibility Criteria.

1.    Wells Fargo's Obligation to Prepare and Disseminate
       Accurate Monthly Reports

Section 10.06(a) of the Indenture provides that the "Issuer *or its designee* shall compile

and provide to each Rating Agency, the Indenture Trustee, the Asset Manager, the FPA Provider

and the Hedge Counterparties, and, *upon written request therefor*, any Holder of a Note shown

on the Note Register a monthly report (the 'Monthly Report')."  (Indenture § 10.06(a) (emphasis

added).)  Wells Fargo concedes that it is the Issuer's designee to prepare the Monthly Report and

deliver it to the enumerated entities.  (WF Brf. 9-10 n.8; CAA §§ 2(b)(v) & 2(c).)  Notably, the

Issuer is not a specified recipient of the Monthly Reports under the Indenture or the CAA and

Noteholders, such as WestLB or EAA, do not receive Monthly Reports unless they request the

reports expressly.  (Indenture § 10.06(a); CAA § 2(b)(v).)  There are no allegations in the

Complaint and no evidence is otherwise in the record regarding whether WestLB, as the prior

owner of EAA's Class A Notes, actually received or reviewed the Monthly Reports prior to

transferring the Class A Notes to EAA in 2009.

7

In preparing the Monthly Reports, Wells Fargo is required under Section 2(c) of the CAA to perform various calculations, including calculations to determine whether the limitation on CDO Securities was breached.  (*Id.* at § 2(c)(xxii) & (xxviii).)  Specifically, Section 2(c)(xxii) required Wells Fargo to "[i]dentify (based exclusively on the information provided by Collineo) the Aggregate Principal Amount of all CDO Securities … and the permitted Aggregate Principal Amount thereof pursuant to Article XII of the Indenture."  Section 2(c)(xxviii) requires Wells Fargo to "[c]alculate the respective percentages of the Aggregate Principal Amount of … the Maximum Investment Amount … for each aggregate amount referred to in clauses (viii) through (xxii)."  Notably, Wells Fargo's obligation to perform calculations under Section 2(c) in connection with preparing the Monthly Reports is distinct from its obligation under Section 2(e) to determine if the Eligibility Criteria have been met at the time of the Grant.

Once Wells Fargo as Collateral Administrator has prepared a Monthly Report, Wells Fargo as Trustee is required to "compare the information contained therein to the information contained in its records with respect to the Collateral and … notify the Issuer and the Asset Manager if the information contained in the Monthly Report does not conform."  (Indenture § 10.06(a).)  To perform this function, Wells Fargo is to draw from, among other things, the calculations it is required to perform under Section 2(e) of the CAA, and the Collateral Database it is required to maintain under Section 2(b) of the CAA.  (*See* CAA §§ 2(b) & 2(e) (noting that the calculations are required "[i]n reference to Section 12.02 of the Indenture").)

      2.   <u>Collineo's Obligation to Assist Wells Fargo in the Preparation and Dissemination of Accurate Monthly Reports</u>

The CAA requires Collineo to assist Wells Fargo to prepare accurate Monthly Reports, providing that "Collineo shall review and verify the contents" of such reports.  (Compl. ¶ 45; CAA § 2(g).)

**III.    DEFENDANTS BREACHED THEIR OBLIGATIONS TO PLAINTIFFS UNDER THE TRANSACTION AGREEMENTS**

Despite all the safeguards that HOE I secured in the Transaction Agreements, Wells Fargo and Collineo repeatedly purchased CDO Securities in breach of the Eligibility Criteria and then falsely reported that the CDO Eligibility Criteria had been met.

**A.    Defendants Breached the Eligibility Criteria By Purchasing CDO Securities In Excess of the 15% Limit**

Between April 2006 and July 2007, Wells Fargo and Collineo caused HOE I to purchase €129.5 million of CDO Securities that were in excess of the 15% limit for CDO Securities at each relevant purchase date.  (Compl. ¶ 50.)  For example:

- In April 2006, Wells Fargo and Collineo caused HOE I to purchase  €20 million of CDO securities, bringing the total percentage of CDO assets held by HOE I up to *21.14%*.

- In June 2007, Wells Fargo and Collineo caused HOE I to purchase  €40 million worth of CDO securities in two separate transactions, bringing the total percentage of CDO securities held by HOE I at that time up to *19.50%*.

- In July 2007, Wells Fargo and Collineo caused HOE I to purchase €50 million of CDO securities in two separate transactions, increasing the CDO concentration level at that time to *21.92%*.

(Compl. ¶ 50.)  These assets (collectively, the "Excess CDO Securities") have significantly deteriorated in value.  Over 80% of these assets have already defaulted and are now worth almost nothing, resulting in realized losses to HOE I and its investors of approximately €107 million. (*Id.* ¶ 51.)  The remaining portion of these CDO assets are expected to default soon, resulting in a total projected loss to HOE I's collateral base, at the time the Complaint was filed, of approximately €120 million.  (*Id.*)

**B.    Defendants Compounded Their Breaches By Issuing False Monthly Reports**

To make matters worse, Wells Fargo and Collineo prepared and issued Monthly Reports that falsely represented the CDO Security Eligibility Criteria as being satisfied, thus concealing

their breaches.  (Compl. ¶¶ 52-54.)  The Monthly Reports were highly detailed reports in small

point font that generally ran 30 pages long.  (*See e.g.* Pickhardt Ex.[1] 1.)  The back half of the

report is a dense listing of what purports to be the assets in the portfolio, identifying each asset

by CUSIP number and short name monikers, as well as various short-hand "Specified Type"

descriptors.  (*Id.* at 11-27.)  The first three and half pages of the reports, however, provide

summary information that purports to convey to anyone reading the reports a concise summary

of the financial status of the CDO, and whether all of the Eligibility Criteria have been met.  (*Id.*

at 2-6.)  For example, anyone reviewing the April 2006 report would ostensibly need to look no

further than page 5 to confirm that the Portfolio Tests—including the "Limitation on CDO

Securities" test —had "Passed." (*Id.*)

It now appears, however, that Defendants were only able to represent the CDO

Limitation Test as "Passed"—when, in fact, it had failed—by categorizing HOE I's Collateral in

ways that had no connection to the Indenture requirements.  For example, on pages 11 through

13 of the April 2006 Monthly Report, Defendants listed a number of assets and labeled them by

purported "Specified Type."  (*Id.* at 11-13.)  The Indenture defines many different types of

"Specified Type[s]" (*see, e.g.,* Indenture at 44), but Defendants apparently made up additional

ones.  (Compl. ¶ 54.)  The April 2006 report does not identify a single asset as a "CDO Security"

(which is the relevant Specified Type in the Indenture), but instead identifies several assets as

either a "CBO/CDO/CLO" or a "CDO Structured Product" Specified Type (neither of which is

referenced or defined in the Indenture).  (Pickhardt Ex. 1 at 11-13.)  In fact, the assets included in

both the "CBO/CDO/CLO" and "CDO Structure Product" Specified Type categories were CDO

Securities as defined in the Indenture.  The Monthly Report also notes that "CBO/CDO/CLO"

---

[1]  "Pickhardt Ex." refers to exhibits attached the Declaration of Jonathan E. Pickhardt in
Opposition to Defendants' Motions to Dismiss, filed concurrently herewith.

assets comprised €76.6 million, or 7.9% of the CDO's aggregate balance, and "CDO Structured Product" assets comprised €103 million, or 10.6% of the CDO's aggregate balance.  (Compl. ¶ 54.)  Omitted from either bucket was an additional €30 million in CDO Securities that Defendants did not report at all.  (*Id.*)

Added together, all of these CDO Securities exceeded the 15% cap on CDO Securities specified in the Indenture's Eligibility Criteria.  (Indenture § 12.02(28).)  However, Defendants reported the "Limitation on CDO Securities" test as having "Passed" by arbitrarily counting only those CDO Securities that were in the "CBO/CDO/CLO" bucket, while completely ignoring both the CDO Securities allocated to the "CDO Structured Product" bucket and the additional €30 million of CDO Securities that appeared in neither bucket.  (Compl. ¶ 54.)  Had Defendants simply added together the two buckets they created, they would have reported a CDO Securities concentration of 18.5%, a clear breach of the "Limitation on CDO Securities" test that should have been conspicuously listed as "Failed" on the summary pages of the Monthly Reports.

### C.     Defendants Admit Their Reporting Errors

In April 2011, Wells Fargo was alerted to these discrepancies.  (*Id.* ¶ 55.)  In response, Wells Fargo acknowledged its errors and, going forward, Defendants issued reports that consolidated both the "CBO/CDO/CLO" bucket and the "CDO Structured Product" bucket when calculating whether the "Limitation on CDO Securities" test had passed or failed.  (*Id.*)

### D.     The Parties Discuss Plaintiffs' Allegations and Execute a Tolling Agreement

In 2011, Plaintiff EAA and Wells Fargo began negotiations regarding the allegations alleged in the Complaint and, on April 3, 2012, all parties to this action executed a Tolling Agreement.  The parties' negotiations did not resolve the dispute.  This action followed.

## ARGUMENT

The Transaction Agreements impose clear contractual obligations on the Defendants to purchase assets in compliance with the Eligibility Criteria and to report their compliance with such criteria accurately. Defendants' failure to fulfill these obligations has already caused HOE I's Collateral base to suffer realized losses of nearly €107 million and further losses of approximately €15 million are expected. Collineo asserts no substantive defense and Wells Fargo just points its finger at Collineo; both Defendants resort to technical defenses, none of which warrant dismissal on the pleadings.

## I.      MOTION TO DISMISS STANDARD

A Rule 12(b)(6) motion "is a method of testing the sufficiency of the statement of the claim for relief." 5B Fed. Prac. & Proc. Civ. § 1349 (3d ed.). The Court accepts as true the Complaint's factual allegations and draws all inferences in favor of Plaintiffs. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 358 (2d Cir. 2013). The motion should be denied if Plaintiffs have alleged sufficient facts to state a claim that is plausible on its face. *See id.* at 359.

In considering a Rule 12(b)(6) motion, a court may review the complaint and any documents attached to it or incorporated by reference. *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).[2] "Once the District Court [is] presented with matters outside the pleadings, Rule 12(b) afford[s] two options. The court could…exclude[] the extrinsic documents

---

[2]   The Second Circuit recognizes only "a narrow exception" to this general rule in order to "allow[] a court to consider 'a document upon which [the complaint] *solely* relies and which is *integral to the complaint*.' " *Williams v. Time Warner, Inc.*, 440 Fed. Appx. 7, 9 (2011) (2d Cir. 2011) *citing Roth v. Jennings*, 489 F.3d 499, 509 (2d. Cir. 2007) (emphasis supplied). However, the plaintiff's actual reliance "on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers*, 282 F.3d at 153. *See also M.E.S., Inv. v. Snell*, 712 F.3d 666 (2d Cir. 2013) (only statements incorporated within or integral to the complaint may be considered in connection with a Rule 12(b)(6) motion).

… [or] the court [is] obligated to convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56." *Id.* at 154. *See also Global Network Communs., Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (conversion to summary judgment motion when the court considers matters outside the pleadings is mandatory and strictly enforced).

## II.   WELLS FARGO BREACHED THE TRANSACTION AGREEMENTS

Wells Fargo's contention that HOE I and EAA have failed to adequately allege a breach by Wells Fargo does not withstand even minimal scrutiny.  Wells Fargo's dual role as Trustee and Collateral Administrator provided it with at least two contractually-required opportunities to ensure that all asset purchases complied with the Eligibility Criteria.  First, as Collateral Administrator, Wells Fargo was responsible for verifying that any asset Collineo selected for inclusion in the Collateral would not breach the Eligibility Criteria.  Second, as Trustee, Wells Fargo was prohibited from acquiring any asset that would breach the Eligibility Criteria. Nevertheless, Wells Fargo recklessly disregarded both duties and, after the assets were acquired in breach of the Eligibility Criteria, Wells Fargo breached the CAA and Indenture again when it prepared false Monthly Reports that concealed its and Collineo's breaches.  Wells Fargo's only answer is that Collineo—not Wells Fargo—is to blame.  This position has no basis in the Transaction Agreements and, even if Wells Fargo was allowed to rely entirely on Collineo to make such determinations (which it was not), there is no evidence that Wells Fargo actually did.

### A.   Wells Fargo Breached the Transaction Agreements By Investing in the Excess CDO Securities

#### 1.   Wells Fargo Breached the CAA By Failing to Determine, at the Time of Purchase, that the Excess CDO Securities Violated the Eligibility Criteria

The CAA expressly requires Wells Fargo (as Collateral Administrator) to verify that the Eligibility Criteria are met *before* any asset is purchased for inclusion into the Collateral.

Section 2(e) of the CAA provides that "Wells Fargo *shall perform* the following functions … *as of the date of the Grant* of any obligation or security *proposed to be included in the Collateral*," and that one of those functions is to "determine if the Aggregate Principal Amount of all [CDO Securities]…does not exceed [15%] of [the] Maximum Investment Amount." (CAA § 2(e)(xxiii).)  It is logical for Wells Fargo as Collateral Administrator to be charged with this verification responsibility as Wells Fargo as Collateral Administrator is the entity responsible for maintaining a database of the Collateral. (CAA § 2(b).)

Wells Fargo concedes that it is required to make this determination (which Wells Fargo characterizes as "calculations that correspond[] to certain of the Indenture's Eligibility Criteria"), but then argues that this obligation has nothing to do with ensuring that the Eligibility Criteria are satisfied.  (WF Brf. 11.)  That makes no sense.  What possible purpose could there be for Wells Fargo to "determine" if the Maximum Investment Amount for CDO Securities will be "exceed[ed]" on a "proposed" purchase, if not to stop purchases that would breach the Eligibility Criteria?  Under Wells Fargo's theory, once Wells Fargo as Collateral Administrator determines that the Eligibility Criteria would be breached, Wells Fargo as Collateral Administrator is required to do absolutely nothing, while Wells Fargo as Trustee should then purchase the assets *knowing* that such purchase would breach the Eligibility Criteria.  There is no good faith reading of the CAA that would render that interpretation correct.  *See RCG, LLC v. Am. Broadband Commc'ns, LLC*, 11 CIV. 257, 2011 WL 2162974, *3 (S.D.N.Y. May 31, 2011) (rejecting defendant's construction of contract because it "would produce an absurd result, and such interpretations are to be avoided.")

The thrust of Wells Fargo's argument appears to be that Wells Fargo cannot be responsible for *ensuring* that a proposed purchase complies with the Eligibility Criteria because

it is Collineo's responsibility to *select* the proposed assets.  (WF Brf. 11.)  This does not follow and Wells Fargo's citation to Section 2(a) of the CAA to support its argument fares no better.  (WF Brf. 11.)  Section 2(a) does not abrogate any of Wells Fargo's duties under the CAA and Section 2(e) of the CAA states expressly that Wells Fargo, as Collateral Administrator, "shall" be responsible for "determin[ing]" whether the Maximum Investment Amount cap will be exceeded by a proposed transaction.  (CAA § 2(e)(xxiii).)

Wells Fargo then argues that it is absolved of its Section 2(e) requirements because it has "no obligation to determine whether any item of Collateral meets the definition of 'Underlying Asset.'"  (WF Brf. 11-12.)  This argument is a red herring.  Determining whether an asset satisfies the Eligibility Criteria is different from determining whether it is an "Underlying Asset."  The Indenture defines "Underlying Asset" as a type of asset that satisfies twenty-three different criteria, only one of which is whether the asset meets the Eligibility Criteria.  (Indenture 47-49.)

Wells Fargo further contends that the CAA imposed no obligation on Wells Fargo "independently to determine whether an asset identified by the Asset Manager as a CDO Security … had been properly categorized" and that under Section 2(e) of the CAA, Wells Fargo was entitled to "rely on the Asset Manager correctly to identify the asset's Specified Type, including whether it was a CDO Security."  (WF Brf. 12.)  This contention is unsupported, however, as nothing in Section 2(e) provides that Wells Fargo can abdicate its duties in reliance on Collineo.  (*See* CAA § 2(e)(xxiii).)  To the contrary, Wells Fargo must perform these duties by reference to the database the CAA requires Wells Fargo to maintain. (CAA § 2(b)(iv).)

But, even if Wells Fargo is correct that it was permitted to rely upon Collineo to identify the Specified Type of HOE I's assets (WF Brf. 12), Wells Fargo's motion must still be denied because discovery is necessary to determine whether Wells Fargo actually relied on Collineo,

15

and even if it did, whether Wells Fargo performed the calculations correctly.  Indeed, if one were to draw inferences from the Monthly Reports, it would appear that *none* of the securities in HOE I's Collateral were properly categorized under the Specified Type "CDO Securities" but that Wells Fargo nonetheless performed calculations for those Monthly Reports in which it arbitrarily and incorrectly assumed that "CBO/CDO/CLO" assets were CDO Securities while "CDO Structured Product" assets were not.  This undermines Wells Fargo's claim that it was, in fact, relying on Collineo "correctly to identify the asset's Specified Type, including whether it was a CDO Security."  In any event, viewed in the light most favorable to Plaintiffs, the facts alleged are sufficient to support Plaintiffs' claims that Wells Fargo breached the CAA.

> 2.      Wells Fargo Breached the Indenture By Investing in the
>         Excess CDO Securities

Apart from its obligations as Collateral Administrator, Wells Fargo as Trustee is responsible for ensuring that the Eligibility Criteria will be satisfied for a particular asset before acquiring that asset for inclusion into the Collateral.  Section 12.02 of the Indenture provides that the Trustee may "invest[] in an Underlying Asset *if*, after such investment, the [Eligibility Criteria] are satisfied ... or not made worse."  (Indenture § 12.02 (emphasis added).)

Wells Fargo admits that it was responsible for acquiring the assets (WF Brf. 4, 6), and does not deny that Section 12.02 prohibits acquisitions that breach the Eligibility Criteria.  Instead, Wells Fargo argues that "the Asset Manager [*i.e.*, Collineo] [was] solely responsible for choosing the Underlying Assets."  (WF Brf. 9.)  Again, Plaintiffs do not allege that Wells Fargo should have *chosen* other assets for purchase.  Rather, Wells Fargo as Trustee was not permitted to *invest* in the assets Collineo "proposed" if, as here, purchasing such assets would breach the Eligibility Criteria.  To make this determination, Wells Fargo should have had to look no further

than the collateral database it was required to maintain (CAA § 2(b)(i)&(iv)) and the calculations

it was required to perform at the time Collineo proposed purchasing the assets (CAA § 2(e)).

Wells Fargo argues that the Indenture requires the Asset Manager to certify to the Trustee

that the assets conform with the Eligibility Criteria, and that under Sections 6.01(c)(v) and

6.03(f), Wells Fargo is entitled to rely on such certifications.  (WF Brf. 9.)  Section 6.01(a),

however, trumps both of those provisions (*see* Indenture §§ 6.01(c)(i), 6.03)), and 6.01(a)(ii)

provides that "in the case of any such [certifications] … specifically required to be furnished to

the Indenture Trustee," Wells Fargo "*shall be under a duty* to examine the [certifications] to

determine whether or not they substantially conform to the requirements of this Indenture."

(Indenture § 6.01(a)(ii).)   Therefore, because such certifications were required by the Indenture

(WF Brf. 9), Wells Fargo was not entitled to blindly rely on them without confirming that they

conformed with the requirements of the Indenture.  Notably, for the reasons discussed above,

even if Wells Fargo received certifications from Collineo that were consistent with the reporting

in the Monthly Reports, the fact that such certifications would have included fictitious "Specified

Type" categories would mean that they did not conform with the Indenture requirements and

Wells Fargo was therefore not entitled to rely on them.

In any event, even if Wells Fargo was permitted to rely on such certifications, this motion

must still be denied because no discovery has been taken to determine if Collineo provided Wells

Fargo with such certifications and, if Collineo did, what those certifications contained and

whether Wells Fargo actually relied on them before purchasing the Excess CDO Securities.

**B.      Wells Fargo Breached the Transaction Agreements By
            Preparing False Reports**

As Wells Fargo concedes, the Issuer "delegate[d] responsibility for preparation of the

Monthly Reports to [Wells Fargo as] the Collateral Administrator."  (WF Brf. 9-10 n.8; CAA §§

2(a) and 2(b)(v).)  To prepare the Monthly Reports, the CAA requires Wells Fargo to calculate whether certain Eligibility Criteria have been met (CAA § 2(c)), including whether the CDO Securities cap was exceeded (*Id.* at § 2(c)(xxii) & (xxviii)).  Wells Fargo argues that it was not required to either state whether newly-acquired assets "comport with the Indenture's Eligibility Criteria," or state the "total amount of CDO Securities."  (WF Brf. 12.)  Despite Wells Fargo's litigation position today, Wells Fargo did in fact purport to account for all assets in the portfolio (WF Brf. 13), including whether the "Limitation on CDO Securities" test had "Passed." (Pickhardt Ex. 1 at 5.)  In any event, regardless of whether or not it was contractually required to report this information, once Wells Fargo did so, it was contractually bound to report accurate information.

The Indenture specifically requires Wells Fargo to verify the accuracy of the Monthly Reports by comparing the information reported in the Monthly Reports to Wells Fargo's own records, and to "notify the Issuer and the Asset Manager if the information contained in the Monthly Report does not conform" to its records.  (Indenture § 10.06(a).)[3]  It is not a credible defense for Wells Fargo to argue that accurate Monthly Reports would not necessarily have prevented the breaches of the Eligibility Criteria as the Monthly Reports were not prepared as of the time of each asset's acquisition.  (WF Brf. 13.)  If Wells Fargo had accurately reported that the CDO Limitation test had "Failed" from the first breach in 2006, it would have highlighted the purchase of the ineligible CDO Securities at a time when the Defendants could have taken immediate steps to mitigate Plaintiffs' risks of loss (such as by selling the ineligible assets) and prevent subsequent purchases of additional ineligible CDO Securities in breach of the Eligibility Criteria.  In any event, as with Wells Fargo's other defenses, the claim that Wells Fargo did not

---

[3]  As noted elsewhere, Wells Fargo could perform these functions independently by referencing the Collateral database it was contractually required to maintain.  (CAA § 2(b)(iv).)

breach the CAA and Indenture by preparing false monthly reports is highly fact intensive and thus not susceptible to resolution on the pleadings.

### C.    Plaintiffs Have Sufficiently Alleged Declaratory Judgment Claims

Wells Fargo's only argument to dismiss the declaratory judgment action assumes all other claims against Wells Fargo will be dismissed.  (WF Brf. 14-15.)  Because Plaintiffs have sufficiently pled other claims against Wells Fargo, Plaintiffs' declaratory judgment claim has been pled sufficiently too.

## III.    PLAINTIFFS ADEQUATELY ALLEGED DEFENDANTS' CULPABILITY

Defendants argue that Plaintiffs have not pled gross negligence adequately.  (WF Brf. 13-14; Collineo Brf. 21-25.)  This argument is misplaced because there is nothing in the Indenture that limits Wells Fargo's liability as Trustee to gross negligence.  Moreover, Plaintiffs have adequately alleged facts that lead to a plausible inference of gross negligence by Defendants under the CAA and AMA.  Indeed, Defendants contend it was gross negligence as a matter of law simply for WestLB, as a mere investor, to have not *caught* Defendants' wrongful conduct.  Surely, then, Plaintiffs have at least alleged facts from which a fact finder could conclude it was gross negligence for Defendants to have actually *committed* the wrongful conduct.

### A.    The Indenture Does Not Limit the Trustee's Liability to Gross Negligence

There is nothing in the Indenture that limits Wells Fargo's liability as Trustee to conduct amounting to gross negligence.  Therefore, all of Defendants' exculpatory clause arguments are limited to Collineo's obligations under the AMA and Wells Fargo's obligations under the CAA.

### B.    Defendants Acted With Gross Negligence Under the AMA and CAA

Plaintiffs are not required to plead gross negligence with particularity.  Instead, to survive a motion to dismiss, Rule 8(a) requires only that the "facts alleged and any reasonable inferences that can be drawn in [Plaintiffs'] favor give rise to a plausible claim for relief."  *Bayerische*

*Landesbank v. Aladdin Capital Mgmt, LLC*, 692 F.3d 42, 64 (2d Cir. 2012). Therefore, Collineo's suggestion that Plaintiffs are subject to a heightened pleading standard, such as a need to identify the specific collateral at issue (Collineo Brf. 22-23), is just not correct.[4] Moreover, because gross negligence is "a matter for jury determination," and "because of the subtle distinctions that differentiate gross negligence from negligence," courts are "reluctant to terminate the proceedings at [the motion to dismiss] stage without allowing the parties to conduct formal discovery." *Robin Bay Associates, LLC v. Merrill Lynch & Co.*, 2008 WL 2275902, at *6 (S.D.N.Y. June 3, 2008). *See also Am. Motorist Ins. Co. v. Morris Goldman Real Estate Corp.*, 2004 WL 1396260, at *4 (S.D.N.Y. June 18, 2004) ("Whether or not particular conduct constitutes gross negligence is usually construed as a question of fact for a jury to decide.")

In this case, Plaintiffs' allegations of gross negligence are compelling.[5] Wells Fargo as Collateral Administrator and Collineo as Asset Manager systematically disregarded their duties under the CAA to such a degree that their breaches could only be the result of either a reckless disregard for, or an outright intentional abdication of, their contractual obligations. For example,

_____

[4]    Defendants also cite (WF Brf. 13-14; Collineo Brf. 21-24) cases that apply a "particularly high standard of gross negligence" in an exculpatory clause context. *See Industrial Risk Insurers v. Port Authority of New York and New Jersey*, 387 F.Supp.2d 299, 305 (S.D.N.Y. 2005). Underlying all of those case is *Colnaghi USA Ltd. v. Jewelers Protection Services,* which considered whether New York public policy justified *abrogating* a clause which exculpated a party for ordinary negligence, without expressly identifying conduct for which the party would be liable. *See Colnaghi USA Ltd. v. Jewelers Protection Services, Ltd.*, 81 N.Y.2d 821, 824 (1993). *Colnaghi* noted that while the plaintiff's allegations there were "suggestive of negligence or even 'gross negligence' *as used elsewhere*," they did "not evince the recklessness *necessary to abrogate* Colnaghi's agreement to absolve Jeweler's from negligence claims." *Id.* (emphasis added). *See also Industrial Risk*, 387 F.Supp.2d at 304, 306-08 (same, where the exculpatory clause applied to "any claim"). This heightened standard does not apply here because the exculpatory clauses at issue in this case specifically permit gross negligence claims and there is thus no issue that holding the Defendants liable for gross negligence would abrogate the protection of an exculpation provision to which they would otherwise be entitled.

[5]    They are also obviously sufficient to put Defendants on notice of the assets at issue. (*See* Collineo Brf. 10.)

Wells Fargo completely abandoned its responsibility under Section 2(e) of the CAA because it failed, on at least *six separate occasions* involving transactions relating to €129.5 million of CDO Securities, to properly determine whether a proposed asset purchase would violate the Eligibility Criteria.  (Compl. ¶ 50.)  Indeed, as noted above, there is no evidence that Wells Fargo has *ever* performed the calculations Section 2(e) requires Wells Fargo to perform.

Plaintiffs further allege that Defendants "compounded and concealed their breaches of the Eligibility Criteria by misrepresenting the amount of CDO Securities held by HOE I in the Monthly Reports."  (Compl. ¶ 52.)  In particular, Plaintiffs allege that Defendants created two separate CDO buckets for reporting CDO Securities—the "CBO/CDO/CLO" and "CDO Structured Product" buckets—that "were simply made up out of thin air."  (Compl. ¶ 53.)  The use of such fabricated asset categorizations over the span of years further supports Plaintiffs' claims that Wells Fargo and Collineo knowingly failed to conform their conduct to the Indenture requirements.  Furthermore, Defendants "routinely omitted some CDO securities held by HOE I from the Monthly Report[s] altogether" (*Id.*) and repeatedly ignored the assets categorized as "CDO Structured Products" when performing the calculations for the  "Limitation on CDO Securities" tests *every month* for at least *7 full years*. (Compl. ¶¶ 53-55.)  And these errors did not occur in isolation.  As alleged in the Complaint, they were part of a broader practice by the Defendants of recklessly disregarding their contractual obligations, including Wells Fargo's own unforced errors that led to a completely avoidable event of default in 2011.[6]  Defendants' systemic failures to comply with their contractual obligations, and their issuance of false reports that effectively concealed their breaches from HOE I's investors, are exactly the kind of

---

[6]   (Compl. pp. 18–19.)  Plaintiffs did not include the allegations in the Complaint regarding this Event of Default as the basis for a separate cause of action against Wells Fargo, but merely to support Plaintiffs' allegations that Defendants' reckless disregard for their contractual duties was systematic and rose to the level of gross negligence.

"reckless disregard for the rights of others" if not "intentional wrongdoing" that satisfies the gross negligence standard Defendants cite.  (WF Brf. 14; Collineo Brf. 21-25.)

Moreover, Defendants' argument that Plaintiffs have not sufficiently pled gross negligence is belied by Defendants' own statute of limitations arguments against EAA.  (WF Brf. 20-21; Collineo Brf. 16-17.)  Defendants claim that this Court can determine that WestLB was grossly negligent as *a matter of law* for failing *as an investor* to uncover Defendants' breaches. At a minimum, Defendants' argument amounts to a concession that there is at least a question of fact as to whether Wells Fargo and Collineo were grossly negligent in failing to fulfill their *contractual duties* to ensure compliance with the Eligibility Criteria.  *See Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co.*, 261 A.D.2d 117, 123 (1st Dep't. 1999) ("[W]here no discovery has been conducted, we cannot say as a matter of law that [the defendant] fulfilled its obligations under [its contract with the plaintiff].  'Where the inquiry is to the existence or nonexistence of gross negligence…the question [is] a matter for jury determination.'") (internal quotations and citations omitted).

## IV.  PLAINTIFFS HAVE STANDING TO ENFORCE THE TRANSACTION AGREEMENTS AND SEEK REDRESS FOR THEIR INJURIES

### A.  HOE I Has Standing to Enforce Its Contracts and Protect Its Collateral

HOE I is a party to each of the Transaction Agreements it seeks to enforce in this Action. Nevertheless, Wells Fargo argues that HOE I lacks standing to enforce the Indenture because HOE I has no pecuniary interest in the performance of its own assets, and because HOE I is *in pari delicto* with the Defendants.  Collineo argues that HOE I assigned all rights under the Transaction Agreements to the Trustee.  Plaintiffs address each argument in turn.

1.    <u>HOE I Has Injury In Fact Standing to Enforce the Indenture</u>

Wells Fargo's argument that HOE I lacks injury in fact standing (WF Brf. 21-24) is foreclosed because the First Department considered and rejected the very argument that Wells Fargo advances here.  In *Hildene Capital Mgmt., LLC v. Bank of New York Mellon*, 963 N.Y.S.2d 38 (1st Dep't 2013), "Defendants argue[d] that [the CDO Issuer] PreTSL XX does not have standing to assert a claim for damage to the Trust Estate, because any alleged injury was sustained by nonparty noteholders, not PreTSL XX."  *Id.* at 40.  The *Hildene* court rejected that argument because "PreTSL XX has 'an actual legal stake in the matter being adjudicated' and therefore has standing …."  *Id.* (citing *Society of Plastics Indus v. County of Suffolk*, 77 N.Y.2d 761, 722 (1991)).  By quoting that specific excerpt from *Society of Plastics*, the *Hildene* court was undeniably addressing the same injury in fact analysis that is contemplated by the Constitution.  *See Society of Plastics*, 77 N.Y.2d at 722 ("Whether derived from the Federal Constitution or the common law…[t]he existence of an injury in fact—an actual legal stake in the matter being adjudicated—ensures that the party seeking review has some concrete interest in prosecuting the action....").

Moreover, the *Hildene* court held that, as a signatory to the Indenture, the Issuer has standing to assert a claim for breach of that contract arising out of a sale of assets that the Indenture did not permit being sold, and the fact "[t]hat any recovery PreTSL XX obtains may have to be distributed to noteholders does not alter this conclusion."  *Hildene*, 963 N.Y.S.2d at 40.  So too here.  HOE I has an "actual legal stake," and therefore an Article III "injury in fact," in the matter being adjudicated.  As a signatory to the Indenture, it has standing to assert a claim that its assets cannot be invested in a manner that the Indenture prohibits.  That any recovery HOE I obtains might later be distributed to Noteholders and Certificateholders does not alter this conclusion.  Indeed, all proceeds *any* corporation receives in litigation will ultimately benefit its

creditors and equity holders, but those corporations still have standing to enforce the agreements to which they are parties.  Not surprisingly therefore, courts routinely entertain suits where one of the parties is a CDO Issuer, without anyone contending successfully that they lack standing.[7]

Moreover, contrary to Wells Fargo's claims otherwise (WF Brf. 22-23), the clear terms of the Indenture expressly provide that the Issuer should take an active role in litigation.  For example, the Indenture expressly provides that HOE I "shall enforce all of its material rights under the [AMA] and [CAA]."  (Indenture § 7.07(c).).  And, indeed, Wells Fargo does not contend that HOE I lacks standing to bring claims against Wells Fargo as Collateral Administrator for breaches of the CAA, even though HOE I's pecuniary interest in recoveries on those claims is indistinguishable from its pecuniary interest in recoveries on the Indenture claims.[8]  Moreover, none of the provisions Wells Fargo cites limits HOE I's ability to sue under the Indenture, and it is inconceivable that HOE I retained the right to sue Wells Fargo as Collateral Administrator but somehow relinquished its right to sue Wells Fargo as Trustee when the same or similar conduct breached the Indenture.  Both the IAS Court and the First Department rejected such an absurd result in *Hildene*, and this Court should too.

2.   Wells Fargo's In Pari Delicto Affirmative Defense Fails

Wells Fargo concedes that its *in pari delicto* affirmative defense can only succeed upon proof that HOE I was an "active participant" and "at least equally at fault as [Wells Fargo] in causing the harm."  (WF Brf. 24.)  There is nothing from the face of the Complaint, or any of the

_____

[7]   *See, e.g.*, *Hildene*, 963 N.Y.S.2d at 40; *Beacon Hill CBO, II, Ltd. v. Beacon Hill Asset Mgmt. LLC*, 314 F. Supp. 2d 205 (S.D.N.Y. 2003).

[8]   Even Collineo concedes that HOE I has standing to sue Wells Fargo under the Indenture.  (Collineo Brf. 19.)

documents referenced in the Complaint, however, that would support that finding.[9]  Conceding

that point, Wells Fargo asks this Court instead to draw factual and legal inferences in Wells

Fargo's favor, based on cherry picked extrinsic evidence that Wells Fargo has impermissibly

appended as Exhibits 6-9 of the Johnson Declaration—exhibits that have yet to be subject to any

discovery and therefore may not be considered at this stage.  *See Chambers*, 282 F.3d at 154;

*Global Network*, 458 F.3d at 154-55.

　　　Even if the Court chooses to consider the improperly submitted exhibits (which would

require converting Wells Fargo's motion into one for summary judgment) the documents do not

establish *in pari delicto* as a matter of law.  First, the Officer's Certificates (Johnson Exs. 6 & 7)

are not "necessarily inaccurate" as Wells Fargo contends.  (WF Brf. 25.)  No discovery has been

taken on them, but they do not purport to represent, warrant, or guarantee compliance with the

Eligibility Criteria, nor are they required to do so.  Further, Wells Fargo does not explain how

these certificates—the earliest of which was issued after Wells Fargo had improperly purchased

the Excess CDO Securities—evidence any role by HOE I in acquiring the Excess CDO

Securities.  As for the Accountants' Reports (Johnson Exs. 8 & 9), no discovery has been taken

on them either, but on their face they state that *Wells Fargo* provided all of the information

considered by the accountants, *Wells Fargo* was acting "on behalf of the Issuer" in all respects,

and the Eligibility Criteria determinations with respect to CDO Securities could not be

performed because *Wells Fargo* did not provide the necessary information.  (*Id.* at 1-2.)

　　　Thus, even on the evidence Wells Fargo submitted, there is no basis to conclude that

HOE I was an "active participant" and "at least equally at fault" as Wells Fargo in causing the

harm alleged here.  This affirmative defense, therefore, does not provide a basis for dismissing

---

[9]  Plaintiffs need not plead sufficient facts in the Complaint to anticipate and defeat affirmative defenses.  *See Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471, 476 (S.D.N.Y. 2009).

HOE I's claims on the pleadings and should be rejected at this stage. *See BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 219 (2d Cir. 2006) (vacating district court's order because plaintiff's alleged wrongdoing "was far less culpable than defendants' and because, in any event, plaintiff's wrongdoing was not in any meaningful respect the cause of defendants'… misconduct, the doctrine of in *pari delicto* is not here applicable."). *See also Lehman Bros, Inc. v. Piper Jaffray & Co.*, 2008 WL 5129084, at *12 (citing *Hilgendorff v Hilgendorff*, 241 AD2d 481, 482 (2d Dept 1997) (*in pari delicto* did not excuse contract breach when the contract was lawful on its face and there was no implication that it was entered into with fraudulent design)); *Nomura Sec. Int'l, Inc. v. E*Trade Sec., Inc.*, 280 F. Supp. 2d 184, 201 (S.D.N.Y. 2003) (*in pari delicto* is not a defense to breach of contract when the injured party was not involved in the illegal scheme). At the very least, Wells Fargo's defense cannot be decided at this stage and its motion to dismiss should be denied. *See In re KDI Holdings, Inc.*, 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999) (citing *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990) ("Where both parties are in delicto [at fault], but not in pari delicto [equally at fault], a trial court should make findings regarding the respective amount of blame assigned to each, granting relief to the one whose wrong is less.")).

3.    HOE I Has Standing to Enforce the AMA Against Collineo

Collineo focuses on Indenture Sections 1.01 and 15.01(a) for the proposition that HOE I "assigned to Wells Fargo all of [HOE I's] rights" in the AMA. (Collineo Br. 18.)  Collineo completely ignores, however, Section 5.11, which makes clear that any rights accorded Wells Fargo are "cumulative" and do not "prevent the concurrent assertion [by HOE I]…of any other appropriate right or remedy," and Section 7.07(c), which directs that the "Issuer shall enforce all of its material rights and remedies under the [AMA]."

Underscoring the cumulative and overlapping nature of these remedies is Section 15.01(a) itself, under which the Trustee grants the Issuer a license to exercise all rights under the

AMA.  Collineo argues that this is "revoked upon a breach by Collineo" (Collineo Brf. 18), but that is true only if a sufficient threshold of Noteholders gives notice of the breach to the Trustee *and* the Asset Manager. (Indenture § 15.01(a).)  The Complaint alleges notice of a breach by EAA to Wells Fargo (Compl. ¶ 58), but there is no allegation or other evidence to be considered at this stage of any such notice having been provided by EAA to Collineo.  Thus, by its terms, the license to HOE I provided for under Section 15.01(a) has not been revoked.

Collineo argues further that there "would be no reason for Wells Fargo to grant HOE I a license to exercise its rights under the AMA if it had retained any of those rights."  (Collineo Brf. 19.)  That is not true.  As noted above, the Indenture is replete with overlapping rights and responsibilities and the very next section clarifies that the assignment made in 15.01(a) is executed as "collateral security" and "shall not in any way impair or diminish the obligations of the Issuer under the provisions of the [AMA]."  (Indenture § 15.01(b).)

It would furthermore be improper for the Indenture to be interpreted in a manner that would prevent HOE I from taking necessary action to protect its rights under the AMA where Wells Fargo as Trustee has abjectly failed to do so.  As alleged in the Complaint, in 2011, EAA directed Wells Fargo to bring suit to remedy the breaches alleged in the Complaint, including Collineo's breaches of the AMA.  (Compl. ¶ 58.)  Wells Fargo refused to do so, necessitating that HOE I bring the claims that Wells Fargo had failed to bring to protect HOE I and its investors.  Wells Fargo's refusal is particularly troubling in light of the fact that Wells Fargo's primary defense in this action appears to be that the breaches of the Eligibility Criteria were Collineo's fault (and not its own).  While Plaintiffs believe HOE I properly sought to mitigate any injury from Wells Fargo's failure to bring claims by bringing the claims itself, to the extent the Court were to agree with Collineo that only Wells Fargo had standing to bring such claims,

and that they are now time barred from doing so, HOE I will seek leave to amend the Complaint to assert an additional claim against Wells Fargo for any damages resulting from Wells Fargo's wrongful refusal to assert claims against Collineo under the AMA.

### B.   EAA Has Standing to Redress Its Injuries and Enforce the Transaction Agreements

Wells Fargo argues that EAA lacks standing because EAA has suffered no harm, that EAA does not have the right to assert causes of action that accrued before it held the Notes, that EAA is not a third party beneficiary under the CAA, and that EAA has not complied with the "no action" clause in the Indenture. Collineo joins Wells Fargo on only the last point, but all of these arguments fail.

### 1.   EAA Has Alleged and Experienced Injury

To argue that EAA has suffered no pecuniary harm, Wells Fargo cites a number of irrelevant cases that stand for the unremarkable proposition that damages are unavailable when there has been no breach and/or when the claimed damages are too speculative.[10] (WF Brf. 15-16.) Tellingly, Wells Fargo ignores *Argonaut Partnership, LP. v. Bankers Trustee Co. Ltd.*, 1997 WL 45521 (S.D.N.Y. 1997), which was cited in Plaintiffs' premotion letter and which held that, under New York law, a breach of contract case "is ripe immediately upon the breach, even where damages remain uncertain." *Id.* at *5. As Judge Mukasey recognized in *Argonaut*,

---

[10]   *See National Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 530 (S.D.N.Y. 2004) (refusing to grant damages for total value of business when intervening act caused demise of business); *Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d 777, 779 (1st Dep't 1988) (no breach of confidentiality claim where plaintiff could identify no confidential information that was disclosed, or how the disclosure of the information caused damages); *WestLB AG v. BAC Florida Bank*, 2012 WL 4473445, at *5-6 (S.D.N.Y. 2012) (holding that defendants did not breach the contract); *Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.*, 2010 WL 4449366, at *3 (S.D.N.Y. Oct. 13, 2010) (no finding that collateral suffered realized loss, only that plaintiffs had subordinated security position and that any "increased risk is contingent on future events that may not occur").

"diminution of the collateral securing the Notes affects the resale value of the Notes," which

"could cause immediate, rather than future damages."  *Id.* at \*7.  Similarly in this case, and in

contrast to the cases Wells Fargo cites, Wells Fargo breached its contracts by violating the

Eligibility Criteria, and that breach has already resulted in *realized losses* to HOE I's Collateral

of approximately €107 million.  (Compl. ¶ 51.)  These damages are not speculative.  Indeed 80%

of the Excess CDO Securities have already been written down and Plaintiffs expect to realize a

near complete loss on the rest.  HOE I has not realized *any* losses on its non-CDO assets to date.

(Compl. ¶ 10.)  Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs have stated a

plausible claim that Defendants' purchase of the Excess CDO Securities caused realized

pecuniary harm to EAA.

Wells Fargo also points to a Forward Purchase Agreement ("FPA"), a document

extraneous to the Complaint and upon which no discovery has been taken, to argue that the FPA

"fully protect[s] EAA from any future loss."  (WF Brf. 16.)  Even if the court could consider this

document on this motion to dismiss (it cannot), such consideration would not change the

analysis.  First, as noted above, EAA has already experienced pecuniary damage due to

Defendants' breaches, and EAA is entitled to relief today.  Second, it is not a defense to breach

of contract that the plaintiff is insured or that some other entity may in the future make the

plaintiff whole.  *See Sch. Dist. of City of Niagara Falls, N.Y. v. CrossPointe, LLC*, 2012 WL

1144618, at \*2 (W.D.N.Y. Apr. 4, 2012) (applying New York law and holding that plaintiff may

recover damages for breach of contract even though plaintiff was "later reimbursed by [a third

party]") (citing *ADM Investor Servs., Inc. v. Collins,* 515 F.3d 753, 755 (7th Cir.2008)

(Easterbrook, J.) ("That a third party reimburses part of a loss does not disable the injured person

from recovering under tort or contract law.... How [the plaintiff] and [the third party] settle

accounts between themselves is none of [the defendant's] business.")).  Third, and one of the reasons that the FPA should not be considered at this stage without further discovery, as part of its assumption of the Class A Notes, EAA also assumed all of WestLB's duties under the FPA. Thus, even if the FPA would *in theory* protect EAA from losses, it would not do so *in fact* as EAA is now the obligor under the FPA and would thus be in the position of assuming whatever losses it reimbursed to itself.[11]

### 2.   WestLB Assigned All Rights to EAA

Wells Fargo argues that EAA lacks standing to sue Wells Fargo as Collateral Administrator because, under New York law, such claims are transferred only if they are conveyed explicitly.  (WF Brf. 16.)  While this may be a correct statement of New York law, WestLB's assignment of the Notes to EAA is governed by German law, not New York law, because Germany is the "center of gravity" to the transfer.  *See Brink's Ltd. V. South African Airways*, 93 F.3d 1022, 1030-32 (2d Cir. 1996) (applying South African law because "the Republic of South Africa clearly is the center of gravity…and has the greatest interest in having its law applied") (internal citations omitted).  The HOE I Notes were transferred from one German entity (WestLB) to a German public law agency (EAA) in Germany by operation of a German contract executed pursuant to a German statute.  (Zetzsche Decl. ¶¶ 30-32.)[12]  Under German law, the transfer from WestLB to EAA automatically conferred all of WestLB's rights,

---

[11]    Alternatively, if EAA has yet to experience injury, EAA's claim has not yet accrued, and the statute of limitations has not begun to run.

[12]    It is irrelevant that there is a New York choice of law provision governing the Indenture.  *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 272 F. Supp. 2d 319, 330 (S.D.N.Y. 2003) *aff'd and adopted*, *In re Bankers Trust Co.* 450 F.3d 121 (2d Cir 2006) ("The governing law clause in the indenture … has no relevance to the question whether the contracts of sale ... operated to assign certain rights of action. This question is controlled, as to each sale, by New York choice of law principles.") (internal quotations omitted).  *See also Racepoint Partners, LLC v. JPMorgan Chase Bank*, 2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006).

including its right to bring breach of contract claims, on EAA.  (*Id.*)  Therefore, because WestLB would have had standing to bring breach of contract claims against Wells Fargo under the CAA, EAA has standing too.[13]

> 3.  The Indenture's "No Action" Clause Does Not Apply to EAA's Claims

Courts read "no action" clauses narrowly, construing them "strictly" in accordance with their terms.  *See Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466, 473 (S.D.N.Y. 2011) ("[c]ourts strictly construe a 'no action' clause in accordance with its terms"); *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, 2004 WL 1444868, at *5 (S.D.N.Y. June 25, 2004) ("'no action' provisions apply according to their terms and are not broadly construed").  Strictly construing the "no action" clause in Section 5.08 of the Indenture does not preclude EAA's claims under the CAA and AMA for several reasons.

*First*, the "no action" clause has no application since it is expressly limited to proceedings "with respect to this Indenture, or for the appointment of a receiver or Indenture Trustee, or for any other remedy hereunder."  (Indenture § 5.08.)  Since EAA's claims against Wells Fargo and Collineo under the CAA and AMA are neither claims with respect to the Indenture nor brought seeking a remedy provided under the Indenture, such claims are not within the ambit of the "no action" clause.  *See Howe*, 783 F. Supp. 2d at 473 (interpreting "no action" clause "in accordance with its terms").

*Second*, the "no action" clause has no application since it is additionally limited to claims regarding "a continuing Event of Default."  (Indenture § 5.08(a).)  On at least two prior

---

[13]   The result is the same under New York law.  The Split Off Agreement transferred "all asset items that are directly or indirectly legally or economically attributable to the securities portfolio."  *See* Split Off Agreement, § 3.1 (Ex. D to Zetzsche Decl.).  Such language transferred all of WestLB rights to bring claims to EAA as a matter of New York law.  *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 151-52 (2d Cir. 1995) (assignment of "rights, title and interest" transferred all rights to bring contract and tort claims).

occasions, when construing "no action" provisions that are nearly identical to the one at issue here, this Court has held that the provision "applies by its terms to only claims relating to an 'Event of Default' seeking payment on the notes themselves" and *not* to claims "seeking damages for mismanagement of the trust collateral and a failure to safeguard plaintiff's rights." *Metropolitan West*, 2004 WL 1444868, at *4-5.  *See also Howe*, 783 F. Supp. 2d at 473-74 (same).  As EAA's claims under the CAA and AMA do not pertain to a continuing Event of Default, such claims are not within the ambit of the "no action" clause for this reason as well.

*Third*, even if EAA's claims did fall within the scope of the "no action" clause in the Indenture (which they do not) any requirement that EAA demand that Wells Fargo sues itself for breaches under the CAA would be excused as futile.  It is well settled that "no action" clauses do not apply to suits against indenture trustees as "it would be absurd to require the debenture holders to ask the Trustee to sue itself."  *Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).  *See also Ellington Credit Fund v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 162, 186 (S.D.N.Y. 2011) ("no action" clause did not preclude claims against trustee).  That same reasoning applies with respect to EAA's claims under the CAA as it would be equally absurd to demand that Wells Fargo, as Trustee, sue itself as Collateral Administrator.

The cases Defendants cite (WF Brf. 18-19; Collineo Brf. 20-21) do not compel a different result: each involved claims that fit within the express scope of the "no action" clause at issue and none required demands that a trustee sue itself.  *See Ellington Credit Fund*, 837 F.Supp.2d at 183 (construing "no action" clause that extended to claims "with respect to this Agreement, the Insurance Agreement, the Indemnification Agreement or the Certificate Insurance Policies…");[14]

---

[14]   Further, in *Ellington*, this Court expressly distinguished *Metropolitan West* by noting that the "PSA in [*Ellington*] does not require certificateholders to 'give written notice to the Trustee of a continuing Event of Default' prior to initiating any claim, or even define that term."

*Victor v. Riklis*, 1992 WL 122911, at *6 & n.7 (S.D.N.Y. May 15, 1992) (finding provision relating to "*any* remedy with respect to [the] Indenture *or the Securities*" barred RICO claim (emphasis supplied)); *Walnut Place LLC v. Countrywide Home Loans, Inc.*, 948 N.Y.S.2d 580, 581 (1st Dep't 2012) (finding provision relating to "*any provisions of this [PSA]* to institute any suit"[15] barred claim alleging breach of the PSA (emphasis added)).

Collineo fares no better contending that the Indenture, CAA, and AMA should be read together, citing *Ellington* for the proposition that such "no action" clauses exist "to protect… securitizations … from the expense of litigating an action brought by a small group of certificateholders that most investors would consider not to be in their collective economic interest." (Collineo Brf. 21.)  First, reading the AMA and CAA with the Indenture does not alter the fact that the "no action" clause expressly applies only to claims "in respect of the Indenture" or brought thereunder, and simply underscores the holdings in both *Howe* and *Metropolitan West*.  Second, there would be no benefit to "most investors" in finding EAA's claims barred by the "no action" clause where HOE I is itself a plaintiff in the action on behalf of the entire securitization and any recovery would serve to bolster HOE I's collateral portfolio as a whole.

             4.      <u>EAA Is a Third Party Beneficiary of the CAA</u>

Wells Fargo's argument that EAA is not a third party beneficiary under the CAA is unavailing.[16]  "In determining third party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement," and it is "well-settled that the

---

*Ellington*, 837 F. Supp.2d at 185 n.12.  The HOE I Indenture, by contrast, does both. (Indenture § 5.08(a); § 5.01.)

[15]  *See Walnut Place LLC v. Countrywide Home Loans, Inc.*, 2012 WL 1138863, at *2 (N.Y. Sup. Ct. Mar. 28, 2012) ("No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement....").

[16]  EAA's status as an intended third party beneficiary of the AMA is not challenged.

obligation to perform to the third party beneficiary need not be expressly stated in the contract."
*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991).

As Collineo points out (Collineo Brf. 21), the Transaction Agreements must be read together.  This is particularly true because the CAA expressly references the Indenture, noting that it is "*pursuant to the terms of the Indenture*" that "the Issuer pledged certain collateral (the 'Collateral') as security for the Notes," and that "the Issuer wishes to engage Wells Fargo to perform certain administrative duties with respect to the Collateral *pursuant to the Indenture*." (CAA, p. 1 (emphasis added).)  The Indenture itself plainly states that the Grant of the Underlying Assets comprising the Collateral, as well as the grant of the CAA and AMA, were done "for the benefit of the Secured Parties."  (Indenture, Granting Clauses.)  EAA is a Noteholder, and therefore is a Secured Party.  (Indenture, p. 43.)  Moreover, as its name implies, the purpose of the CAA is to administer the Collateral.  This includes "monitoring" the Collateral (CAA § 2(a)), maintaining a database of the Collateral (§ 2(b)), preparing the Monthly Reports (§ 2(c)) and the Note Valuation Reports (§ 2(d)), and ensuring compliance with the Eligibility Criteria (§ 2(e)).  The only purpose of these functions is to manage and secure the Collateral for the benefit of the Noteholders such as EAA.

The cases cited by Wells Fargo are not to the contrary.  In *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 66 N.Y.2d 38 (1985), the city contracted to remedy a nuisance created by the plaintiff to benefit the public, not to benefit plaintiff.  *See id.* at 43, 45.  In *Rivera v. Bank of America Home Loans*, 2011 WL 1533474 (S.D.N.Y. Apr. 21, 2011), the government contract at issue expressly defined the actions that constitute a default, and they did not cover the action plaintiff asserted.  *See id.* at *5.  In *MacDraw, Inc. v. CIT Group Equipment Financing, Inc.*, 1994 WL 17952 (S.D.N.Y. Jan. 18, 1994), the defendant bank executed several loan

agreements to facilitate the purchase of equipment by its customer, Laribee, from the plaintiff. Reviewing the different loan agreements together, the court found no evidence that either the bank or Laribee intended to confer third party rights to the plaintiff equipment seller, and the bank expressly did not assume Laribee's rights. *See id.* at *13.  While one of the agreements in that case contained language similar to some of the language in the CAA's "Successors and Assigns" clause, the clause in the CAA is intended to *extend* the reach of the CAA by binding the successors and assigns of Wells Fargo, the Issuer and Collineo.  (CAA § 14.)  It does not *limit* the Noteholders' third party beneficiary rights—rights that the Indenture plainly recognized.

At most, there is a dispute of fact as to whether the parties intended EAA to be a third party beneficiary to the CAA, which makes this question inappropriate for resolution on a motion to dismiss.  *See Oost-Lievense v. N. Am. Consortium, P.C.*, 969 F. Supp. 874, 879 (S.D.N.Y. 1997), *adhered to on reconsideration,* 95 CIV. 0559 (HB), 1997 WL 401665 (S.D.N.Y. July 17, 1997) ("The resolution of plaintiff's status is, ultimately, a question of fact for the jury to decide.").

## V.     THE STATUTE OF LIMITATIONS DOES NOT BAR THIS SUIT

Under New York law, a statute of limitations argument is an affirmative defense on which the defendant has the burden of proof.  *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004).  As such, "dismissing claims on statute of limitations grounds at the complaint stage is only appropriate if the 'complaint clearly shows the claim is out of time.'" *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, 2013 WL 1286170, at *15 (S.D.N.Y. Mar. 28, 2013) (citing *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999)).  In essence, "the plaintiff must 'plead[] itself out of court.'"  *Nelly de Vuyst, USA, Inc. v. Europe Cosmetiques, Inc.*, 2012 WL 246673, at *7 (S.D.N.Y. Jan. 6, 2012) (citation omitted).  If there are any facts that would support an inference that the statute of limitations has not yet run, the motion to

dismiss on statute of limitations grounds should be denied.  *See also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 2013 WL 1294668, at *8 (S.D.N.Y. Mar. 28, 2013) (Sullivan, J.) ("Plaintiffs have alleged facts that would support an inference that they had neither actual nor constructive knowledge of the facts underlying their claims …. Accordingly, Defendants' motion based on the statute of limitations is denied.").  Defendants cannot meet their burden.

### A.      HOE I Is Subject to the Cayman Islands' Statute of Limitations

"Each claim of the non-New York residents must be assessed independently, in terms of the place of accrual and the applicable statute of limitations."  *Maiden v. Biehl*, 582 F. Supp. 1209, 1212 (S.D.N.Y. 1984).  HOE I is a Cayman Islands company incorporated under the laws of the Cayman Islands, with its only place of business in the Cayman Islands.  (Compl. ¶ 12; Indenture §§ 7.03(a), 14.03(a).)  Defendants' misconduct here damaged HOE I's Collateral. Therefore, HOE I's economic harm is felt in the Cayman Islands.  This should be the only inquiry, as it was in *Phoenix Light SF Limited v. ACE Securities Corp.*, 2013 WL 1788007, at *4 (N.Y. Sup. Ct. Apr. 14, 2013), where the court applied the six-year Cayman Islands and Irish statutes of limitations to claims accruing to CDO issuer plaintiffs based in the Cayman Islands and Ireland.  *See also Baena v. Woori Bank*, 2006 WL 2935752, at *6 (S.D.N.Y. Oct. 11, 2006) ("If the injured party is a corporation, then the place of residence for the purposes of CPLR § 202 is traditionally the state of incorporation or the corporation's principal place of business.").

It does not matter that HOE I assigned certain rights in the Collateral to Wells Fargo in trust, as this was simply the creation of a security interest for the benefit of the Noteholders which empowers the Trustee to act as the Issuer's "true and lawful attorney" to "exercise all rights of the Issuer."  (Indenture, Granting Clause at 2; § 6.17.)  Most importantly, the Indenture recognizes that HOE I still owns the Collateral.  (*Id.* § 7.22(a)(i) ("The Issuer owns and has good and marketable title to the Collateral...").  *See also id.* § 7.22(a)(ii) ("Other than the security

interest granted to the Indenture Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral.").)[17]

There is therefore no reason to treat HOE I differently than any other company when applying the statute of limitations.  *See Robb Evans & Associates LLC v. Sun Am. Life Ins.*, 2013 WL 123727, at *1 (S.D.N.Y. Jan. 8, 2013) ("Unsurprisingly, the Receiver has not identified a case in which a court has applied the limited *Lang* exception to hold that a corporate entity's claims accrued outside of its principal place of business.").  All of the cases Collineo cites (Collineo Brf. 13-15) involve actual trusts—not corporate entities like HOE I.  Creditors and shareholders are the ultimate beneficiaries of any corporation, yet courts do not undertake a factual analysis to determine the location of, and economic impact to, every shareholder and creditor of every plaintiff who ever files suit.  The Court need not do so here either.[18]  The six-year Cayman Islands statute applies to HOE I's claims and Collineo's motion should be denied.

## B.    The German Statute of Limitations Does Not Bar EAA's Claims

Defendants apply two separate statute of limitations standards for the claims EAA asserts.  First, for EAA's claims related to the breach of the Eligibility Criteria, Defendants argue that Sections 195 and 199 of the German Civil Code apply, which provide that the three year

---

[17]    *See also* Indenture at 16, (defining "Eligible Investment" and specifying that "the ownership of such investment will not . . . subject the Issuer to [net income tax]..."); *id.* at 45-46 (defining "Synthetic Security" with similar terms); *id.* § 7.19(f) ("The Issuer shall not...become the owner of any asset if the ownership...would cause the Issuer to be engaged...in a trade or business within the United States").

[18]    Even if the Court were inclined to undertake such an analysis, discovery would be needed before the Court could do so.  There are no facts alleged in the Complaint as to the identity and location of all the HOE I Noteholders and Certificateholders and Collineo provides no evidence supporting its allegations that HOE I "holds assets entirely for the benefit of German entities."  (Collineo Brf. 14.)  Discovery would also be needed on Collineo's allegations, with no citation to factual support in the Complaint or otherwise, that Hypo Real Estate Holding AG consolidated HOE I on its financial statements.  Discovery would be needed to determine when and why such reporting started, and whether that should affect the statute of limitations analysis.  On this record, this is no basis to apply the German statute of limitations to HOE I.

statute of limitations begins to run at the end of the year in which WestLB (or EAA) knew, or should have known but for WestLB's (or EAA's) own gross negligence, of the breach.  (WF Brf. 20; Collineo Brf. 16.)  Second, with respect to the false Monthly Report claims, Collineo argues that Section 37a of the German Securities Trading Act applies, which provides that a three-year statute of limitations begins to run from the date of the breach, regardless of EAA's knowledge.  (Collineo Brf. 15-16; WF Brf. 20 n.16.)  Defendants are mistaken on both counts.[19]

1.      EAA Is Not Barred From Asserting Claims for
Breach of the Eligibility Criteria

There is no evidence in the record that EAA (or WestLB) actually knew that assets had been purchased in breach of the Eligibility Criteria, thus Defendants can succeed only if they can demonstrate, as a matter of German law, that EAA (or WestLB) was grossly negligent in not having known of these breaches at least three years prior to EAA entering into negotiations with Wells Fargo relating to their claims in 2011 or early 2012 at the latest (Zetzsche Decl. ¶ 24).  Defendants concede that this is a particularly high standard to overcome.  (WF Brf. 20 ("fails to exercise the diligence that is required ... in a particularly serious manner"); Hesdahl Decl. ¶ 9 ("the most simple and obvious observations are not made and most evident facts have not been considered").)  As the German Supreme Court has observed, an investor is considered grossly negligent only if it "closed its eyes when the [investment advisor or asset manager] pressed the relevant information into [its] face."  (Zetzsche Decl. ¶ 21.)  Defendants simply cannot meet that high standard here.

Central to Defendants' argument is that WestLB should have known, as early as 2007, that Wells Fargo and Collineo breached the Eligibility Criteria based on the information made

_____

[19]   Defendants' claim here that EAA's claims have lapsed is inconsistent with Wells Fargo's argument that EAA has suffered no injury. (WF Brf. 15-16.)

available in the Monthly Reports.  (WF Brf. 20-21; Collineo Brf. 16-17.)  Leaving aside for the moment Defendants' assumption under German law that WestLB's knowledge can be imputed to EAA, this argument fails for many reasons.  First, Defendants argue that WestLB should have scrutinized the Monthly Reports by 2007 because a law enacted four years later (in 2011) requires certain German financial institutions to understand the "structural characteristics of a securitization transaction."  (Hesdahl ¶¶  10, 18.)  But this law does not inform WestLB's obligations before 2011 because it enacted new standards of care.  (*See* Zetzsche Decl. ¶¶ 12-13.) Even if the 2011 law did inform WestLB's pre-2011 obligations, WestLB was not required to scrutinize Monthly Reports to weed out inaccuracies to meet this duty of care.  Instead, WestLB was entitled to meet its monitoring obligations under any one of a variety of different techniques, including by relying on third party ratings agency data, which would not have made Defendants' breaches apparent.  (Zetzsche Decl. ¶¶ 14-15.)  WestLB was also entitled to rely on third parties to monitor WestLB's investments on its behalf (Zetzsche Decl. ¶ 14.), as Wells Fargo was retained to do that as Trustee and Collateral Administrator.

Second, even if WestLB did receive the Monthly Reports, it was hardly gross negligence as a matter of law if WestLB failed to discover Defendants' breaches of the Eligibility Criteria.  Indeed, here are the series of inferences the Court would have to draw to find, as a matter of law, that WestLB was grossly negligent:

- WestLB should have requested and read the Monthly Reports (even though there was no legal requirement or contractual obligation to do so), but did not;

- WestLB should have disregarded the first part of the Monthly Report indicating that nearly all of the Portfolio Tests (including the "Limitation on CDO Securities" Test) had "Passed," but did not;

- WestLB should have evaluated the information pertaining to every asset listed in the Monthly Report (including reviewing what kind of "Specified Type" the asset was (Collineo Brf. 17) and how that compared to the required concentration limit categories), but did not; and

- WestLB should have then recalculated all Eligibility Criteria and other Portfolio Tests for itself, but did not.

With no discovery, we do not know what WestLB did or did not do. But WestLB's failure to do all of this can hardly be considered "gross negligence," particularly when it was *Defendants'* contractual duty to perform this analysis. At most, this raises a question of fact that requires discovery and therefore cannot be decided on a motion to dismiss.

### 2. EAA Is Not Barred From Asserting Claims Arising Out of Defendants' False Monthly Reports

Defendants' suggestion that Section 37a of the German Securities Trading Act ("Section 37a") applies to EAA's claims arising out of the false Monthly Reports is misplaced. Indeed, it appears that even Wells Fargo's expert on German law, Dr. Hesdahl, does not share that view as he applies only German Civil Code §§ 194 and 195 when analyzing EAA's claims. (Hesdahl Decl. ¶¶ 4, 6.) This would likely be because Section 37a applies only to financial reports rendered by companies headquartered *within Germany* (Zetzsche Decl. ¶ 26 n.9; Lorcher Decl. ¶ 14.) and Wells Fargo is not headquartered in Germany. Moreover, Section 37a applies only to information pertaining to an investor's initial investment decision, and not to subsequent reporting like the Monthly Reports. (Zetzsche Decl. ¶ 29.) It is therefore inapplicable here.

Instead, §§ 194 and 195 of the German Civil Code apply to EAA's claims against Defendants arising out of the inaccurate Monthly Reports and, for the reasons noted above, that limitations period does not bar EAA's claims.

### CONCLUSION

For the reasons stated above, Defendants' Motions to Dismiss should be denied.

Dated: New York, New York
       June 28, 2013

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: _____
    Jonathan E. Pickhardt
    J. Toji Calabro
    51 Madison Avenue, 22nd Floor
    New York, New York 10010
    (212) 849-7000

    jonpickhardt@quinnemanuel.com
    tojicalabro@quinnemanuel.com

*Attorneys for Plaintiffs House of Europe*
*Funding I Ltd and Erste Abwicklungsanstalt*

WOLLMUTH MAHER & DEUTSCH LLP

Randall R. Rainer
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

RRainer@WMD-LAW.com

*Attorneys for Plaintiff House of Europe*
*Finding I Ltd.*

41